In re TRACY ANN LUTGEN, a Minor, *et al.* (Eugene L. Tranel *et al.*, Appellants, v. James M. Lutgen, Appellee).

Second District No. 2—87—1197

Opinion filed December 29, 1988.

Gomez, May, McKenrick & Kelly, of Davenport, Iowa (Gary D. McKenrick, of counsel), for appellants.

Lonn C. Francomb, of Galena, and Schirger, Beger & Ferguson, Ltd., of Rockford (William E. Schirger, of counsel), for appellee.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Jill A. Deutsch and Edward T. McAulitte, Assistant Attorneys General, of Chicago, of counsel), for *amicus curiae* State of Illinois.

Joan S. Colen and Aviva Futorian, both of Legal Assistance Foundation of Chicago, of Chicago, for *amicus curiae* Jill Ryan.

Myra Sun and Laurie Woods, both of National Center of Women & Family Law, Inc., of New York, New York, for *amicus curiae* Illinois Coalition Against Domestic Violence.

JUSTICE WOODWARD delivered the opinion of the court:

Respondents, Eugene and Debra Tranel (Tranels), appeal from a trial court's order awarding custody of their nieces, Tracy and Dana Lutgen (children), to their father, James Lutgen (James). We affirm.

On December 21, 1984, James, his wife, Carol, and their children, Tracy and Dana, lived in East Dubuque, Illinois. Prior to that date, the Lutgen family had made plans to go Christmas shopping, roller-skating, and to go out for dinner that evening. However, earlier on the 21st, Carol had filed a petition for dissolution of marriage and obtained an *ex parte* order of protection pursuant to the Domestic Violence Act (Ill. Rev. Stat. 1983, ch. 40, par. 2301–1 *et seq.*). The order was based upon Carol's sworn allegation that on December 20, 1984, James had "grabbed and thrown Petitioner (Carol) in a violent manner to the floor, and did thereafter strike Petitioner." Summons was issued but there is no indication in the record that James had knowledge of this action or that he was served either with the petition for dissolution of marriage or the *ex parte* order of protection. Moreover, James denied being served with either document.

According to James' statements at the time of his arrest and his testimony at the custody hearing, on his way home from work on the evening of December 21, 1984, he passed the Windsor Tap, where he observed Carol and a man sitting in a pickup truck hugging and kissing. Prior to that night, there had been other occasions on which Carol had not returned home from work until 2 or 3 in the morning without explaining her whereabouts to James. Upon his return home, he found Carol already at home, but he did not say anything to her about what he had observed near the Windsor Tap. While Carol was taking a shower, he telephoned his father and told him what he had seen.

Later, Carol told James that he could not take the children out for the evening. James insisted that he was going to take them out as planned, and he began getting dressed. Carol stated again that he was not going to take them. She grabbed James and began choking him. James grabbed her and pushed her back. Carol came at him again, and James grabbed her neck and choked her and then threw

her down to the floor. He told the children to stay out in the living room because he did not want them to see what was happening. Carol got up again and started choking him. James kept choking her until she fell down a second time and began bleeding through the nose. James called his father, who advised him to call the paramedics. Carol was pronounced dead at Mercy Medical Health Center.

It is unclear from the record how much of the altercation between James and Carol was witnessed by the children. It appears that they were present in the home at the time the fight started, and then ran to a neighbor's house for help.

As a result of the incident, James was arrested and charged with murder. The Tranels, Carol's brother and sister-in-law, filed a petition for custody and guardianship of the children. James stipulated that it was in the best interest of the children that the Tranels be awarded custody and guardianship of the children, and an order to that effect was entered. The children then commenced living with the Tranels in Eldridge, Iowa, approximately 60 miles from East Dubuque.

Pursuant to the plea negotiations, the murder charge was reduced to voluntary manslaughter to which James entered a plea of guilty. He was sentenced to a minimum term of four years' imprisonment, of which he served 13 months. Upon his release early in 1986, he petitioned for and was granted visitation with the children.

On May 21, 1987, James filed a petition for custody of the children. The Tranels filed a counterpetition for custody. On September 21, 1987, a hearing was conducted on both petitions. The following evidence was submitted.

Peggy Kammerude testified for the Tranels as follows: She had been a neighbor of James and Carol Lutgen and had baby-sat for their minor children. The witness was then questioned *in camera*. She stated that on the evening of December 21, 1984, the children ran into her house and begged her to go over to their house because James was choking Carol. Both children were crying and screaming. When the witness arrived at the Lutgen house, James met her at the door. She asked what was going on and requested that James calm the children down. James told her that there had been a fight but that everything was all right. The children then went inside the house with James. The witness denied knowing that Carol had been at a bar with her boyfriend prior to coming home that night. The witness also related that Dana had told her about another fight between Carol and James, at which point Tracy indicated that Dana should not have said anything to the witness.

Mary Ellen Schonhoff testified for the Tranels as follows. She had

known Carol and James Lutgen for seven or eight years. She had a daughter the same age as Dana Lutgen, and Carol and the witness would do things together with their daughters. During the summer months, she would see Carol almost everyday, and during the rest of the year, as much as three times a week. Prior to December 1984, the witness observed that Dana had a black eye and both children had bruises on their buttocks. The marks were black and blue, and Carol showed her a paddle that had been broken. However, the witness had no personal knowledge as to the circumstances in which the children received those injuries. She had seen Carol at a luncheon on December 8, 1984. She had not seen her for some time and observed that she had lost a lot of weight. The witness further stated that she observed injuries on Carol but had not personally witnessed the incidents in which these injuries were inflicted.

Vernon Tranel, one of Carol's brothers, testified for the Tranels as follows. He had known James since his marriage to Carol 10 years previous. He would see both James and Carol at family gatherings 6 to 12 times a year. On Father's Day in 1984, Dana disobeyed James, and he ordered her to sit on the couch. After about an hour, the witness asked James if Dana might be allowed to go back and play, but James said no. So Dana remained on the couch for the remainder of the afternoon, about 2½ hours. The witness had never observed injuries on either Carol or the children.

Eldon Tranel, another of Carol's brothers, testified for the Tranels as follows. He had known James since his marriage to Carol. He would see them about four times a year. He never saw James strike the children. Other than just pushing Carol, joking around, he never saw James strike Carol. He did observe bruises on Carol's arm and knee, but he had no personal knowledge as to how these were inflicted. The witness stated that Carol was afraid of James and that as a result, she appeared very uneasy, scared, and nervous, and she also was losing weight. He was going to change the locks on the Lutgen residence, but he never got to it. The witness further stated that he visits regularly with the Tranels and was of the opinion that the children had been integrated into the Tranel family. He also observed James disciplining the children by making them sit down for the afternoon on three occasions.

Sue Tranel, Eldon's wife, testified for the Tranels as follows. She had known James, Carol, and their children for 14 or 15 years. Their children attended the same school. She and her family usually spend every holiday with the Lutgens. She also got together quite often with Carol until Carol started working. She had also observed James

disciplining the children by making them sit still. She also observed bruises on Tracy's buttock that looked like they resulted from a hand spanking. She also observed a mark on the right side of Dana's eye. She did not see their injuries inflicted. In the witness' opinion, the children got along exceptionally well with the Tranels and their children and were treated the same as the Tranels' children.

David Fairweather testified on behalf of the Tranels. He is the principal of Edward White Elementary School in Eldridge, Iowa, which the children presently attend. According to the witness, the children began attending the Edward White School in January 1985, a month after Carol's death. Both children have adjusted well to the school, have made friends, and have made reasonable academic progress. The Tranels conveyed to the witness that they wanted the children to have as normal an environment as possible in school.

Angeline Blavat testified for the Tranels as follows. She has babysat for the Tranel and the Lutgen children since the 1986-87 school year. She has never observed any injuries to any of the children. The witness stated that the Tranels discipline the children by scolding, sending the children to their rooms, or the children are given odd jobs to do. She never observed either of the Tranels strike the children. There were no differentiations in discipline by the Tranels between their children and the Lutgen children, nor had the children complained of such.

The respondent, Eugene Tranel, testified on his own behalf as follows. He is one of the children's maternal uncles; Carol was his sister. He and his wife, Debra, their children, and the Lutgen children reside in Eldridge, Iowa, about 60 miles from East Dubuque. Prior to her death, he would see Carol and her family at least once a month, sometimes more often. He witnessed the same incidents regarding the disciplining of the children by James as previously testified to by the other witnesses. Since Carol's death, he and his wife have had custody of the children, and they have become a part of the Tranel family. There is no differentiation between the children when it comes to discipline. The children were punished by having them do additional jobs, sending them to their room to read a book for 15 or 20 minutes, or if the situation called for it, a hand spanking. He has never kicked any of the children nor spanked them hard enough to leave marks. Prior to 1984, he never observed any injuries on either Carol or the children. As soon as the children began living with him and his wife, he saw that they received professional help because of the trauma involved and the fact that the children had witnessed what happened. The children saw Dr. Hokanson, a child mental health specialist, and

Norma Biando, a therapist. Initially, the children saw them once a week. As the children adjusted, the visits became less often. The last time the children saw either Dr. Hokanson or Ms. Biando was August 1987. The witness and his wife had had several sessions with both Dr. Hokanson and Ms. Biando, discussing the children's progress and seeking guidance on how to handle related matters as they came up.

The witness recounted that when James was released from prison, they had had no notice. He and his wife sought an order of protection, not to deny James access to his children, but to insure that the children would be prepared mentally to deal with the visit. He and his wife had continued to consult with the mental health professionals to determine what was in the children's best interests.

Counsel for James stipulated that the Tranels are proper custodial parents for the children.

Debra Tranel testified on her own behalf as follows. She is the wife of Eugene Tranel and the maternal aunt of the children. She had observed the same incidents as her husband testified to. In addition, she related an incident that took place in September 1984. She was baby-sitting for her children, as well as Tracy and Dana at their maternal grandparents' house. Around midnight, Carol arrived and told her she had to take Dana and Tracy home on James' orders because the children had allowed their cat to escape from the house. The witness testified that she called and explained to James that it was probably the fault of her children that the cat got out, and that she really didn't want to disturb the children at such a late hour. James allowed the children to stay. However, in view of the incident, the witness decided not to allow James to baby-sit for her children the next day as originally planned.

The trial court conducted an *in camera* interview with the children, individually. Both children indicated that they loved James and the Tranels, but they preferred to live with their father. Tracy, then age 11, stated that she wanted to live with James because the Tranels did not treat them fairly. Dana, then age 9, stated that the Tranels hit them and kicked them on occasion, and that she preferred to live with her father.

Meredith Glasgow testified for James as follows. He was employed by the Jo Daviess County sheriff's department from 1961 to his retirement in 1986. He was a lieutenant in charge of the jail facility when he first met James, who was incarcerated there on December 21, 1984. James did not cause any problems while he was incarcerated, and he was allowed to work with minimal supervision.

Eldon Weber testified for James as follows. He is the owner of

Weber Concrete Service and has employed James for 10 years. According to the witness, James holds the position of foreman and is a good, dependable worker. He has never known him to get involved in a fight with another co-worker.

Barbara Lutgen testified for James as follows. She is James' younger sister. She saw James once, sometimes twice a week. She observed him disciplining the children by making them sit in a corner or giving them a swat on the buttocks. She recalled an occasion in 1979 or 1980 when Dana ran out in front of Tracy, who was swinging on a swing. Tracy hit Dana, which gave her a black and blue mark on the side of her head. James went over to see if Dana was alright. Barbara never observed James mistreating his children.

On cross-examination, Barbara indicated that she had told the children that James would probably be hurt if they did not want to live with him. She also stated that she told the children not to be afraid to tell the court where they wanted to live.

Leroy Lutgen, James' father, testified on behalf of James as follows. At the present time, James lives in East Dubuque, Illinois, with Leroy and his mother, Grace. Prior to December 1984, Leroy saw James every one or two weeks. James was strict with the children. If they misbehaved, usually all he would have to do was speak to them, and they would mind. James was also a good provider. He loved the children, and they loved him.

On cross-examination, Leroy testified that he knew nothing of James and Carol's difficulties until Thanksgiving 1984. He has seen the children once a month on weekends for the last couple of years. If James receives custody, James will rent his parent's house from them, and his parents will move into an apartment. Leroy stated that he and his wife had told the children that they would like to have them with them, but he denied telling them that he would cease loving them if they did not tell the court that they wanted to live with Leroy, nor did he tell them that James might be hurt and not love them any more if they did not want to return to Illinois to live.

Under questioning by the trial court, Leroy stated that in the event James was given custody, his wife would care for the children until James returned home from work. He denied ever coaching or telling the children what to say where they wished to live.

Grace Lutgen, James' mother, testified on his behalf as follows. She testified that there are schools within five blocks of their home and that the Catholic church is within two blocks. She saw James and his family once or twice a week and on holidays. Both James and Carol were strict with the children. James would discipline the chil-

dren by correcting them first, and if they did not listen, the children had to sit on a couch or chair. Grace never saw James beat his children. They do things together, like shopping and going out to eat. When the children are not with him, he does not generally go out except to church on Sundays. James does not drink.

On cross-examination, Grace testified that she had talked to the children about the circumstances surrounding their mother's death. She told them that their parents had had a bad argument, and she felt it was not right for their mother not to go along with the plan for that evening (the fact that precipitated the argument leading to Carol's death). She denied telling the children that James did not kill Carol. She had visitation with the children over the last few years by court order. She denied ever allowing the children while on visits to watch a movie depicting naked men and women, although she stated it could have been on the television at her daughter Barbara's. She never pressured the children as to what they should say about where they wanted to live, nor had she ever said anything derogatory to the children about the Tranels.

James Lutgen testified on his own behalf. At the present time, he resides with his parents in East Dubuque. He is employed at Weber Concrete in East Dubuque. He attends church regularly and does not smoke or drink. He is not dating anyone at the present time. He outlined the plans for renting his parents' home to share with the children and for enrolling the children in school. James stated that he also would seek professional help and advice for his children and for himself, if necessary. He was not sure if such services were available in East Dubuque.

James testified further that Carol and he agreed that James would be the one to discipline the children. If the children misbehaved during the day, Carol would inform him, and if she felt a spanking was in order, James would administer it. Carol was always present when the punishment was administered. He never beat his children. Since his release from prison, he has disciplined the children by scolding them, and on one occasion, when they continued to misbehave, he spanked Dana and made both children sit on the couch.

Other than the incident resulting in his wife's death, he has no criminal record. He has accepted responsibility for Carol's death. He has not discussed Carol's death with the children. If the children do want to talk about Carol's death, he will tell them exactly what happened.

According to James, the children love him and show him affection. At the present time, they are not allowed to telephone him or to

visit him other than the time prescribed by the trial court. He is not allowed into the Tranels' home nor is he invited to their family gatherings. On one occasion, there was a mix-up on visitation, and when James arrived to pick up the children, they were gone. The Tranels did not allow him to make up the missed weekend. He indicated that there were negative feelings between the Tranels and himself, but that he hoped in time that the Tranels would get over their anger towards him. James felt that he could be a loving, providing, and good father to the children.

On cross-examination, James testified that if the children questioned him about Carol's death, he would tell them that Carol and he had an argument; that there was pushing and shoving; and he "took her (Carol) to the floor." Carol's windpipe was crushed somehow. He helped her up and called the police. He did everything to save her. He did not realize how gravely injured Carol was. In fact, he believed she was alive until he was informed at the county jail that she had died.

While he was incarcerated, he received no counseling as to the circumstances of Carol's death. After his release, he was given a psychological assessment by Dr. Peterson and was evaluated by Dr. Hokanson. He would seek counseling if it was determined to be necessary. If the trial court awarded custody of the children to the Tranels, he would accept the decision and would maintain as much contact as he could with the children, given the Tranels' feelings towards him.

On examination by the attorney representing the children, James confirmed the incident in which the children had been ordered to sit on the couch for misbehaving.

On redirect examination, James related that on December 21, 1984, the day of Carol's death, he had been out looking for a bicycle for Dana when he passed by a tavern and saw his wife sitting in a pickup truck kissing another man. He proceeded to go home. Carol returned home after he did. While she was taking a shower, James called his father and related to him what he had seen. Carol overheard the conversation. They had had plans for a week to go out Christmas shopping and roller-skating and then go out to eat, but Carol had made other plans. It was then that the fight ensued. He has accepted full responsibility for his wife's death.

After the incident, James counseled extensively with Father Fitzgibbons, a Catholic priest. At first, he would see him two to three times a week and then once a week. He discussed the incident and his actions with Father Fitzgibbons.

Finally, recalling the incident where he wanted to punish the children for allowing the cat to get out at the house, James testified that

he had discussed the matter with his sister-in-law, Debra, at about 10 or 11 p.m. and that she felt her own children had probably let the cat out. Debra felt that in view of the situation, she did not think she should leave her own children with him. The next morning, however, the cat returned home, and James baby-sat for all of the children, including Debra's.

At the conclusion of James' testimony, the trial court was informed that one of the children, Dana, wished to speak to the trial court again. In chambers, Dana stated that she now wished to remain living with the Tranels. However, it was more important to her not to be separated from her sister, Tracy, regardless of where she was placed. She stated that although she had spoken to the Tranels, it was her own idea to talk to the judge. However, when questioned by the court, Tracy related that that morning, the Tranels had all cried at the breakfast table and were talking to Dana, and it was then that Dana told them that she wished to speak to the court again.

Recalled as a witness, Eugene Tranel testified that he had never denied visitation to James or his parents, although there was an instance when there was a mix-up on visitation. In the event the trial court awarded custody of the children to James, he would be able to work out visitation arrangements with James. He further indicated that in the event he and his wife keep custody, he would help support an ongoing relationship between the children and their father and their paternal relatives.

On cross-examination, Eugene testified that he felt the court should outline the visitation schedule. He stated that he had forgiven James, but he had also filed a wrongful death action against him on behalf of Carol's estate. Although he and his wife along with the children passed through the East Dubuque area at least 12 times per year, he has not stopped to let the children say hello to their paternal grandparents because the children have never asked to be allowed to do so. He did not try to make up the missed visitation because the children received a letter from their grandmother, Grace Lutgen, saying that they would see them next time.

Also admitted into evidence by stipulation were the depositions of Norma Biando, the child therapist who counseled with the children, and of Dr. Hokanson, the psychiatrist who evaluated the children.

According to Ms. Biando, initially the children were confused and questioned their mother's death and their father's part in it. The Tranels provided the children with structure which was beneficial for the children. However, one of the difficulties the children encountered was the considerable animosity between the two families. Although

both children had some difficulty deciding where they wanted to live, Tracy now expressed a wish to live with her father, while Dana was very definite that no matter what, she did not want to be separated from Tracy. Ms. Biando was unable to make a recommendation as to a permanent custodian for the children because there had been no contact with the Lutgen family and no home study was done. Ms. Biando stated that the mere fact of a change in where the children live would not necessarily cause a problem.

Dr. Hokanson testified on deposition that she was contacted by the Tranels in February 1985. She did a psychiatric evaluation, obtaining information from the Tranels and interviewing and observing the children individually. The evaluation showed that at that time the children were having an adjustment reaction. They were both grieving the loss of their mother and the disruption to their lives.

Although Dr. Hokanson did not see the children or the Tranels regularly, she followed the children's progress with Ms. Biando. The children have made a good deal of progress in dealing with their mother's death and with their feelings about their father. Initially, they were angry with their father because he had told them everything was going to be all right. Neither child is suffering from any diagnosable psychiatric illness. She also had contact with the Tranels in dealing with their problem of how best to handle the children and later, working with the visitation questions and what to do if James was released. The doctor noted an apparent lack of trust on the part of the Tranels where the Lutgens were concerned.

From Dr. Hokanson's observation of them, the Tranels were not suffering from any diagnosable psychiatric condition as a result of Carol's death. The children had benefitted from their placement with the Tranels. The Tranels handled the children well.

Dr. Hokanson did a psychiatric evaluation on James. She found him to be a shy, rather anxious person, a perfectionist, who put a lot of demands upon himself. His anxiety would not necessarily inhibit his ability to parent the children. Again, Dr. Hokanson had insufficient information about the Lutgens to form an opinion as to what custodial placement would be in the children's best interest. A change in residence would entail another adjustment but whether it would be damaging would be hard to say. Counseling would be helpful in such a situation.

Both children had told Dr. Hokanson that they wished to live with their father. Dr. Hokanson felt that this meant that they wanted to live with James and the paternal grandparents, Dana particularly. Tracy has indicated that she wants to live with James but Dana is not

so sure, if it would just be her father. A placement other than their stated preference would not necessarily be damaging to them, as long as they kept in contact with their other relatives through visitation or family gatherings. Due to lack of information, Dr. Hokanson did not have an opinion as to what placement was in the best interest of the children.

After written briefs were submitted by the attorneys for both parties and the attorney for the children, the trial court issued its written order granting James' petition for custody of the children and denying the Tranels' cross-petition. The trial court found that James was a fit and proper person to have custody of the children and that it would be in the best interest of the children if they be allowed visitation with the Tranels. The trial court also found that the attorney for the children recommended that the children be returned to James. Further, the trial court incorporated James' brief as a foundation for the court's order. This appeal followed.

The Tranels contend, first, that they have standing to seek the custody of the children, Tracy and Dana.

We observe, first, that the question of standing was never raised by James until his closing argument brief, which was adopted by the trial court as a basis for the decision to give custody of the children to James.

■ The "lack of standing" is an affirmative defense and, therefore is subject to section 2—619(a)(9) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a); *In re Custody of Mc-* motion to dismiss must be brought "within the time for pleading." (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)); *In re Custody of Mc-Carthy* (1987), 157 Ill. App. 3d 377, 380.) The trial court does have the discretion to allow the tardy filing of pleadings unless the opposing party can demonstrate it will be prejudiced by the filing. *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.* (1982), 105 Ill. App. 3d 247, 253.

■ Although James filed a motion to strike and dismiss the Tranels' cross-petition for custody and filed affirmative defenses to the cross-petition, he never raised the issue of standing until the trial had been concluded and closing arguments were presented. Moreover, he did not file a formal pleading asking that the cross-petition for custody be dismissed.

There was no proper pleading on file, and the trial court made no finding in the order that the Tranels lacked standing. We cannot find that the trial court determined that the Tranels' lack of standing was a basis for denying the cross-petition. Further, we note the court pro-

ceeded to determine the case on the basis of the best interests of the children. However, for reasons stated below, we affirm the decision of the trial court.

Although not expressed as such, the main issue raised by the Tranels is whether the decision of the trial court granting James custody of Tracy and Dana is against the manifest weight of the evidence. Specifically, they argue that James is unfit to have custody of Tracy and Dana and that granting James custody of the children was not in the best interests of the children.

The Tranels rely on *In re Abdullah* (1981), 85 Ill. 2d 300. In that case, the father appealed a finding that he was unfit under the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501 *et seq.*). The finding was based on depravity. The father had been convicted of the murder of his ex-wife, the mother of the child, and he had been sentenced to an extended term of 60 years' imprisonment. The appellate court (one justice specially concurring and one justice dissenting) reversed the decision of the circuit court, stating that while the factual evidence that formed the basis of the murder conviction might show depravity, the mere fact of conviction did not. Since only the fact of the conviction was before the court, the finding of depravity could not stand. (*Abdullah*, 85 Ill. 2d at 304.) The supreme court granted leave to appeal and initially reversed and remanded the cause for a new trial because the best interests of the child were at stake. After granting the State's petition for rehearing, the court reversed the decision of the appellate court and affirmed the decision of the trial court.

■ In reaching its decision, the court first noted that depravity is "an inherent deficiency of moral sense and rectitude." (85 Ill. 2d at 305.) The court then pointed out that unfitness under the Adoption Act is different than unfitness for the purpose of child custody under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 101 *et seq.*). A parent who, because of a finding of depravity, is held to be unfit under the Adoption Act loses not only the custody of the child but also all residual parental rights. On the other hand, a parent may lose custody but still remain the child's parent, his or her right to the child being subservient to that of the custodial parent. *Abdullah*, 85 Ill. 2d 306.

■ Although a single criminal conviction, without more, will not support a finding of unfitness based upon depravity (*In re Sanders* (1979), 77 Ill. App. 3d 78, 82), the supreme court in *In re Abdullah* found three factors showing the father's depravity, stating as follows:

> "First, he was convicted of murder, the most serious criminal offense there is. Few acts could be more inherently deficient in

moral sense or rectitude than the intentional and unjustified killing of a fellow human being. Second, the murder victim was the mother of the child. Defendant thus deprived his son of his mother and further heightened the psychological scarring by a family already broken by divorce. Finally, the extended term of imprisonment imposed indicates that the murder was accompanied by exceptionally brutal and heinous behavior demonstrating wanton cruelty. [Citation.]" *Abdullah*, 85 Ill. 2d at 306-07.

The result in *Abdullah* does not dictate the result in the case before us. Although *Abdullah* was decided under the stricter standards of the Adoption Act, rather than the Illinois Marriage and Dissolution of Marriage Act applicable in the case before us, there are factual distinctions which require a different result. James was convicted of voluntary manslaughter, not murder. Although the victim was the mother of the children he now seeks custody of, he received the minimum sentence of imprisonment for voluntary manslaughter, four years, and was released at the end of 13 months. Furthermore, the trial court determined that James was a fit and proper person for the custody of the children and that it was in the best interests of the children that they be placed with James. Thus, not all of the factors cited by the supreme court to support the finding of unfitness based upon depravity are present in this case.

The Tranels also rely on cases from other jurisdictions to support their contention that James is unfit, namely, *Brown v. Department of Human Resources* (1981), 157 Ga. App. 106, 276 S.E.2d 155, *In re Geoffrey G.* (1979), 98 Cal. App. 3d 412, 159 Cal. Rptr. 460, and *In re James M.* (1976), 65 Cal. App. 3d 254, 135 Cal. Rptr. 222.

In *In re James M.*, the court affirmed a trial court ruling denying California authorities' petition to declare four children free from the custody and control of their natural father. The father stabbed the mother 22 times with a knife, causing her death. He was convicted of second degree murder and sentenced to five years' to life imprisonment. He was still incarcerated at the time of the hearing on the petition. The court held that that fact was not sufficient to sever the parental ties. The court acknowledged that there may be felonies that, without more, would prove a person unfit to have the custody of his or her children, such as crimes that show the depravity of the person or involving the abuse of a child. However, the court concluded that second degree murder is not one of them.

Moreover, the Tranels rely on language in the opinion wherein the California court stated that the murder of the mother of the children could be committed by their father in such circumstances as to prove

his unfitness. One of the circumstances, certainly, would be if the killing were accomplished in the presence of a child. 65 Cal. App. 3d 254, 135 Cal. Rptr. 222.

In both *Brown v. Department of Human Services* and *In re Geoffrey G.*, the fathers appealed from trial court decisions terminating their parental rights on findings of unfitness, which were based on their convictions for voluntary manslaughter of the mothers of their children. In both cases, the decisions granting the termination of parental rights were affirmed. In the case of *In re Geoffrey G.*, the court noted that the father had a criminal record that showed numerous arrests and convictions for intoxication, and that physical harm might come to the child due to a drunken rage on the part of the father, or if due to intoxication, he was unable to properly provide for the child. In *Brown v. Department of Human Services*, the court noted that in addition to his conviction for voluntary manslaughter, it seriously doubted the father's claims that he could provide the home, education, and parenting needs of his twin daughters, who suffered from developmental retardation. None of the additional facts cited in the last two cases are present in the case before us. Moreover, the language in *In re James M.* relied on by the Tranels is mere *dicta* and not the holding of that case.

Other than the tragic circumstances which resulted in the death of Carol, James has an unblemished record. The attempt on the part of the Tranels to show that James was an abusive parent is not supported by the evidence. Neither our legislature nor our case law in Illinois has seen fit to set forth a rule of law that the killing of one parent by the other in the presence of the children no matter what the circumstances is sufficient to deprive that parent of his or her children on the basis of unfitness. Further, we decline to accept the cases cited from other jurisdictions as controlling upon our decision in this case, given the facts in this case and the distinguishing factors in the cases relied on by the Tranels. We conclude, therefore, in view of these distinguishing factors, that given the evidence before it, there was a proper evidentiary basis for the trial court to conclude that James is a fit and proper person to have the care, custody, and control of Tracy and Dana.

Finally, the Tranels argue that the best interests of the children require that they be placed in their custody.

■ Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 602 *et seq.*) requires that the court consider the following factors in determining custody in the best interests of the child:

"(1) the wishes of the child's parent or parents, as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) the child's adjustment to his home, school, and community;

(5) the mental and physical health of all individuals involved; and

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child."

■ Courts of review in Illinois have held that the determination of child custody rests largely within the broad discretion of the trial court, and its decision will not be disturbed on appeal unless the award is contrary to the manifest weight of the evidence or unless the court has abused its discretion. (*In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 715.) "The presumption favoring the result reached by the trial court is strong and compelling in custody cases because it, rather than the reviewing court, is in a better position to evaluate the credibility of the witnesses and the needs of the children. [Citation.]" 123 Ill. App. 3d at 715.

■ In light of the factors outlined in section 602, the record clearly shows that there was sufficient evidence to support the trial court's decision to award custody to James. James, as the sole surviving parent, wishes to have custody of the children, and they wish to live with him. The children also do not wish to be separated from each other. Although the Tranels have used best efforts to provide for the children, the children still felt they did not receive equal treatment with the Tranels' children. None of the psychological testing argued against placing the children with James. While the court did hear testimony regarding the circumstances of Carol's death, that is still only one of the factors. Further, the Tranels' reliance on *In re Custody of Williams* (1982), 104 Ill. App. 3d 16, is misplaced as that case involved a custody dispute between parents. In the present case, a parent and third parties are involved. (See *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 508.) Additionally, the attorney appointed by the trial court to represent the children throughout these proceedings recommended that custody of the children be given to James.

■ Finally, in this case the death of the mother of the children caused by the father creates a very sensitive issue. The *amici* briefs

filed in this case consider only this fact and allege that the court must deprive the father of custody of the children under these circumstances. At this point, it is appropriate to point out that James was the defendant and convicted of voluntary manslaughter in the criminal proceedings, and the court punished him for the wrong he committed, in accordance with the penalty established by the legislature. This case involves a decision as to the custody of the children, and the legislature has stated that in making this determination, the prime consideration is the best interest of the children. The legislature has set forth six factors as hereinbefore stated to be considered by the court in making this determination. The sixth factor, to wit, the physical violence of the custodial parent witnessed by the children, is but one of the factors the legislature has set forth for determining custody in the best interest of the children, and had the legislature wished to make this factor all controlling, it could have done so by the appropriate legislation. In light of the legislature's failure to do so, it is not the function of this court to "legislate" such a change in the statute.

In this case, the trial court determined under the evidence presented that it was in the best interest of the children that custody be awarded to their father. There was ample evidence to support the decision of the trial court in analyzing the evidence pursuant to the factors set forth by the legislature. It is not the province of this court to violate the appellate rules for review when there is ample evidence to support the trial court's decision.

Therefore, pursuant to the standards for review to be applied by this court, we conclude that the court's award of custody to James was not against the manifest weight of the evidence. For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

NASH and DUNN, JJ., concur.